**PENNSYLVANIA PHARMACEUTICAL ASSOCIATION, et al., Plaintiffs,**

**v.**

**Robert P. CASEY, Governor, et al., Defendants.**

**Civ. A. No. 1:CV–91–378.**

United States District Court, M.D. Pennsylvania.

Sept. 16, 1992.

Victor P. Stabile, Raymond P. Pepe, Christine S. Dutton, Dilworth, Paxson, Kalish & Kauffman, Harrisburg, Pa., for plaintiffs.

Gwendolyn T. Mosley, Office of Atty. Gen., Thomas Brian York, Chief of Litigation, Legal Office—Dept. of Public Welfare, Harrisburg, Pa., for defendants.

## MEMORANDUM

CALDWELL, District Judge.

We are now considering motions for summary judgment filed by both parties. Summary judgment is appropriate in federal court if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693–94 (3d Cir. 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Here, the parties have stipulated to all relevant facts and so we are left only to decide how the law applies to those facts.

### I. *Introduction*

This case presents a complex question and a brief description of the relevant facts will be helpful in presenting the issue.

Under the Medical Assistance Program (Medicaid), 42 U.S.C. § 1396 *et seq.*, the federal government works with state governments to assist low-income individuals in attaining health care. Both the federal and state governments provide funding. States provide plans for approval by the federal Department of Health and Human Services ("HHS"), and when those plans are approved, states are eligible for federal reimbursement, or "federal financial participation." The part of Medicaid involved in this matter is the prescription drug program. The Health Care Financing Administration of HHS ("HCFA") administers this program and can decide to "disallow" certain reimbursement if the state plan is deemed to be not in compliance with HHS Medicaid regulations. In 1991, certain Pennsylvania reimbursement requests were disallowed by HCFA and Pennsylvania appealed to the HHS Departmental Appeals Board ("appeals board"). The Commonwealth, concerned that it would lose further reimbursement, chose not to wait for the appeals board decision and instead adopted the emergency regulations that are the subject of this lawsuit. *See,* amendments to 55 Pa.Code Ch. 1121 effective January 11, 1991. Medicaid drug reimbursement to pharmacists takes two forms, repayment for the medications themselves and a dispensing fee paid to pharmacists for their services. The Pennsylvania emergency regulations modified the price list from which Pennsylvania reimbursed pharmacists for the medications themselves. In most cases, the regulations decreased the

reimbursements. A few months later, the Pennsylvania legislature raised the dispensing fee. The HHS appeals board rendered its decision on March 18, 1992, determining, *inter alia*, that Pennsylvania's plan was acceptable. Plaintiffs now complain that the Commonwealth violated federal law by lowering the drug reimbursement component when it did so.

■ As a threshold matter, we believe the resolution of this matter revolves around the language of the federal statute that forms the basis of plaintiffs' complaint, 42 U.S.C. § 1396r–8(f)(1) as enacted by the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90"). It provides as follows:

(1) No reductions in reimbursement limits

(A) During the period of time beginning on January 1, 1991, and ending on December 31, 1994, the Secretary may not modify by regulation the formula used to determine reimbursement limits described in the regulations under 42 CFR 447.331 through 42 CFR 447.334 ...

(B) During the period of time described in subparagraph (A), *any State that was in compliance* with the regulations described in subparagraph (A) may not reduce the limits for covered outpatient drugs described in subparagraph (A) or dispensing fees for such drugs.

*Id.* (emphasis added). In their briefs, the parties have correctly focused on the question of what "compliance" means in the context of the statute and whether Pennsylvania was, in fact, in compliance with the applicable regulations. Statutory analysis must begin with the "plain meaning" of the statute. *In re Continental Airlines, Inc.*, 932 F.2d 282, 287 (3d Cir.1991). Defendants would have us read in the words "Any State believing itself to be in compliance ..." We decline to do so. If the Commonwealth was actually in compliance when it enacted the emergency state regulations that are the subject of this litigation, those regulations would be in violation of OBRA 90.

II. *Judicial Estoppel*

■ Plaintiffs ask that we hold that defendants are estopped from arguing that Pennsylvania was not in compliance at the time the emergency regulations were issued. They cite the Commonwealth's argument before the appeals board in which the Commonwealth sought to overturn a disallowance issued by the HCFA.

Plaintiffs rely upon a doctrine known as "judicial estoppel," which has been asserted to prevent litigants from taking opposite positions in different adjudications.

To permit a party to assume a position inconsistent with a position it had successfully relied upon in a past proceeding "would most flagrantly exemplify ... playing 'fast and loose with the courts,'" which has been emphasized as an evil the courts should not tolerate.

*Delgrosso v. Spang and Co.*, 903 F.2d 234, 241 (3d Cir.1990) (citations omitted). The rationale for the doctrine is to prevent a party from winning twice based on incompatible positions. 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4477 (supp. 1992) (*citing Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1547–49 (7th Cir.1990). While it is true, as plaintiffs have contended, that defendants apparently prevailed before the appeals board, we believe the positions defendants adopted before that body and before this court are not incompatible. Before the appeals board, defendant argued that the Commonwealth was in compliance with federal Medicaid regulations. Here, defendants are arguing that the Commonwealth had good reason to believe itself to be non-compliant because of various communications from the Office of the Inspector General and HCFA and that that belief warranted the adoption of the emergency regulations in question. This is not, then, a proper case for us to apply judicial estoppel.

III. *Preclusive Effect of Agency Adjudication*

■ Plaintiffs raise another estoppel (or preclusion) question when they assert that the holding of the appeals board that the Commonwealth was in compliance pre-

cludes our re-examining the issue. We find some merit in this proposition. Federal courts may give preclusive effect to fact-finding decisions of federal agencies acting in their adjudicatory capacities. *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). In this case, the determination of the appeals board regarding compliance with its own agency's regulations would seem compelling.[1] While the opinion of the appeals board does not expressly hold that Pennsylvania's plan was in compliance, both parties seem to assume that that was the implicit holding. Indeed, in their brief in support of their motion for summary judgment, defendants posit that "The [appeals board] recognized that the Commonwealth could designate a 'reasonable dispensing fee' for computing the allowable federal aggregate limits. *As a result, Pennsylvania was arguably in compliance during the disputed time period.*" Defendants' Brief at 10 (emphasis added). The appeals board held that Pennsylvania's plan was in compliance and we give considerable weight to that finding.

### IV. *Pennsylvania Was In Compliance Even Without Preclusive Effect*

Even if we were not to afford preclusive effect to the appeals board decision, we would still find that the Commonwealth was in compliance with the federal regulations.

■ As noted, Medicaid is a joint federal-state program. In the area of pharmaceutical services, HHS has established a price schedule for certain multiple source drugs.[2] States may request federal reimbursement for multiple source drugs up to an "upper limit" which incorporates the federal drug price plus a "reasonable" dispensing fee. The applicable regulation holds that "[t]he agency payment ... *must not exceed in the aggregate,* payment levels that the agency has determined ..." 42 CFR

§ 447.332(b). Prior to the adoption of its emergency regulations, Pennsylvania had assumed "... in the aggregate ..." to mean that the state could reimburse pharmacists according to its own price plan, so long as the total for all multiple source drugs plus dispensing fees did not exceed the HHS upper limit. The upper limit was a flexible amount, in that the limits for each state varied according to what its dispensing fees were determined to be. Pennsylvania officials established a program that attempted to raise the Commonwealth's upper limit by taking into account a *median* dispensing fee rather than the *actual* fees, which were somewhat lower. This allowed the Commonwealth to fall within the federal limit and receive full reimbursement. It was with this Pennsylvania policy that HCFA and the Inspector General took issue. *See, e.g.,* Letter of Robert J. Taylor (HCFA official) (February 28, 1989). Those agencies instructed Pennsylvania that it should use the actual dispensing fees in its calculations. In June, 1991, HCFA issued a notice of disallowance to Pennsylvania's Department of Public Welfare, claiming that the Commonwealth had exceeded the federal upper payment limit by $3,152,092 because it used a hypothetical rather than an actual dispensing fee in its calculations. Pennsylvania appealed to the appeals board and it essentially upheld the Commonwealth's program.

We concur in the appeals board conclusion. The regulation itself refers only to a "reasonable dispensing fee" with no indication of how a state should set such a standard. Reference to the regulatory history is helpful. As it was engaged in the rule-making procedure that ultimately modified §§ 447.332 and 447.333 in 1987, HHS recognized the potential conflict:

> This has been a controversial portion of the current regulations because while State agencies are required to conduct

---

1. The appeals board held "... we conclude that the regulations permit a state to calculate the aggregate upper payment limit using an amount other than the dispensing fee which it actually paid." Decision of Appeals Board at 1. This essentially upheld Pennsylvania's plan.

2. Multiple source drugs are what are commonly called "generic" drugs. Their innovators' patents have expired and the drugs are then sold by several companies, some under brand names and some generically.

periodic surveys, *they are not required to base dispensing fees specifically on the survey results.* State Medicaid agencies have contended that the requirement is both burdensome and costly.... Although we have not included a proposal to remove the requirement for the surveys, we specifically invite comments on this issue and on alternative approaches.

51 Fed.Reg. 29,560 (1986) (emphasis added). Later in the process, HHS deleted the survey requirement.

In the interest of State flexibility and to avoid imposing unnecessary Federal procedural requirements as to how State agencies establish such fees, we are deleting the current requirement at § 447.‐333 regarding dispensing fees. State agencies will still be required to determine reasonable dispensing fees or, if dispensing fees are not paid separately, to impute an amount equivalent to a reasonable dispensing fee, in order to include those amounts in the calculations and comparisons they make to meet the upper limit standard for FFP.

52 Fed.Reg. 28,648 (1987). Nowhere does this language indicate that "reasonable dispensing fees" must be actual fees. We agree with the appeals board that the actual fee requirement suggested by HCFA to the Commonwealth is contrary to the expressed desire to afford states flexibility in structuring their programs. We conclude, therefore, that Pennsylvania's plan (prior to the enactment of the emergency regulations) was in compliance with 42 CFR §§ 447.331 through 447.334.

## V. *Defendants' Arguments*

█ Defendants offer several arguments against our applying OBRA 90 to this case. They first maintain that communications between the Commonwealth's Department of Public Welfare and the Inspector Gener‐ al and HCFA had indicated that Pennsylvania was not in compliance and that they acted in reliance thereon. As we noted, *supra,* the defendants ask us to imply a subjective element to the language of OBRA 90, holding that a state could make changes in its plan if *it believed itself not to be in compliance.* The statute reads "... was in compliance...." This requires us only to determine whether the Commonwealth was objectively in compliance.[3] Defendants knew that they could appeal the HCFA determination and, in fact, they did. Given that knowledge, their reliance on those early communications was misplaced. We understand that waiting for the decision in an appeal would have been costly for the Commonwealth had its fears been realized, but that consideration can play no role in our examination.

Defendants further argue that Pennsylvania's emergency regulations do not violate the purpose of the OBRA 90 moratorium. This argument is without merit. We are without guidance as to the legislative intent behind the enactment and so we must rely on the plain language of the statute.[4]

## VI. *Current Dispensing Fee*

In August, 1991, the Pennsylvania General Assembly appropriated funds to increase the dispensing fee and those fees were increased a short time later. In their reply brief, defendants suggest that should we direct the Commonwealth to return to its former price list, we should at the same time rule that the Commonwealth may disavow the dispensing fee increase in 1991. They imply that the legislature acted only in the interests of offsetting the new, lower prescription prices and would not have acted otherwise. We have before us nothing but the bare assertion of defendants' brief that this is the case. Additionally, the

---

3. We are bolstered in this conclusion by a letter forwarded to us by plaintiffs with defendants' concurrence. In it, an HHS official advised the National Association of Chain Drug Stores that a planned change in Tennessee's Medicaid program *would* violate OBRA 90. Letter of William R. Lyons (July 30, 1992).

4. "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived ..." *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805) (Marshall, C.J.). Our research has revealed no legislative history and so we are left with only the words of the statute.

plain language of OBRA 90 prohibits reductions, not increases. We do not, therefore, find merit in defendants' request that we step beyond the mandate of OBRA 90 to allow the Commonwealth to reduce the dispensing fee during the moratorium.

### VII. *Conclusion*

 We agree with plaintiffs and the HHS appeals board that Pennsylvania was in compliance with the applicable federal regulations at the time it adopted the emergency regulations. The plain language of OBRA 90 clearly forbids a compliant state from reducing payments for covered outpatient drugs. The Pennsylvania regulations make the proscribed reductions and we must therefore find them in violation of OBRA 90, 42 U.S.C. § 1396r–8.